

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

New York District Office
33 Whitehall St, 5th Floor
New York, NY 10004
(929) 506-5270
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
### (This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 05/11/2022

**To:** Angel Collazo
824 Wood Ave Apt 2
Bridgeport, CT 06604

Charge No: 16A-2021-00508

EEOC Representative and email:   Amon Kinsey
Supervisory Investigator
amon.kinsey@eeoc.gov

## DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

The EEOC has adopted the findings of the state or local fair employment practices agency that investigated your charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By:Judy Keenan
05/11/2022
Judy Keenan
District Director

**Cc:**

Bruce Matzkin
12 STONEWALL LANE
mailbrucematzkin@gmail.com


Milford Transit District Bus Company
259 Research Drive
Milford, CT 06460


Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a FOIA Request or 2) a Section 83 request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your request for the charge file promptly to allow sufficient time for EEOC to respond and for your review. Submit a signed written request stating it is a "FOIA Request" or a "Section 83 Request" for Charge Number 16A-2021-00508 to the District Director at Judy Keenan, 33 Whitehall St 5th Floor

New York, NY 10004.

You can also make a FOIA request online at https://eeoc.arkcase.com/foia/portal/login.

Enclosure with EEOC Notice of Closure and Rights (01/22)

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA Requests and Section 83 Requests, go to:
https://www.eeoc.gov/eeoc/foia/index.cfm.



**State of Connecticut**
**COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES**
West Central Region Office, 55 West Main Street, 2ⁿᵈ Floor, Suite 210, Waterbury, CT 06702
*Promoting Equality and Justice for all People*

December 15, 2021

Angel Collazo
c/o mailbrucematzkin@gmail.com

**SUBJECT:**   *TRANSMITTAL OF DRAFT SUMMARY OF NO REASONABLE CAUSE*
*CHRO NO.: 2130341 Collazo vs. Milford Transit*
*EEOC NO.: 16A202100508*

**(x) Finding of No Reasonable Cause**
**( ) Administrative Dismissal - Lack of Jurisdiction**

**Dear Complainant:**

Transmitted herewith is a draft summary of No Reasonable Cause . Prior to final action, I am providing you with an opportunity to comment.  You have fifteen calendar days to provide me with any written comments concerning the draft summary.  During this fifteen (15) day period you may also review materials in the case file.  Unless I hear from you within this period, final investigative action will occur on **DECEMBER 30, 2021** .  You may consult with or retain an attorney.  However, such consultation or retention will not extend the period of time for comment beyond the period of time noted above.  Nor will such consultation with or retention of an attorney alter the period of time for reconsideration established by regulation or the statutory period for appeal.

If you do submit comments, they will be reviewed and considered.  However, if your comments do not rebut the substance of the summary or present new evidence that requires further investigation, the draft summary will be finalized.



**State of Connecticut**

**COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES**

West Central Region Office, 55 West Main Street, 2ⁿᵈ Floor, Suite 210, Waterbury, CT 06702

*Promoting Equality and Justice for all People*

Additionally, if you submit written comments you must send a copy of the comments to the opposing party and sign the certification of mailing form attached hereto, and return it to the Commission.

Sincerely,

Shawn Burns, Regional Manager
West Central Region

***Enclosure:   Draft Summary***

Bruce Matzkin
mailbrucematzkin@gmail.com

Lisa Lazarek
llazarek@metzlaz.com

**STATE OF CONNECTICUT**
**COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES**



## FINDING OF **NO REASONABLE CAUSE**

ANGEL COLLAZO

v.

**Milford Transit**

CHRO NO: 2130341                                    DATE FILED: 2/7/2021
EEOC NO: 16A202100508                          DATE FILED: 2/7/2021

### PARTIES

**COMPLAINANT:**                                    **COMPLAINANT'S COUNSEL:**

Angel Collazo                                              Bruce Matzkin, Esq.
824 Wood Ave, Apart 2                            12 Stonewall Lane
Bridgeport, CT 06604                              Branford, CT 06405
AngelACollazo@aol.com                           MailBruceMatzkin@gmail.com

**RESPONDENT:**                                      **RESPONDENT'S COUNSEL:**

259 Research Drive                                   Lisa Lazarek, Esq.
Milford, CT 06604                                     Metzger, Lazarek, & Plumb
                                                               56 Arbor Street, Suite 413
                                                               Hartford, CT 06106
                                                               LLazarek@metzlaz.com

1

## JURISDICTION

☒ The investigator concludes that the Commission has jurisdiction to receive, investigate, and issue a determination upon the merits of this complaint.

☐ The investigator concludes that the Commission does not have jurisdiction to receive, investigate and issue a determination upon the merits of the complaint. Therefore, this complaint is dismissed due to the lack of jurisdiction.

## FINDINGS OF FACT

1. Angel Collazo ("Complainant") filed with the Commission on February 7, 2021, against his former employer, Milford Transit ("Respondent"). Complainant alleged Respondent discriminated against his protected classes of race (Hispanic), color (Hispanic), and previous opposition to discriminatory conduct by terminating, suspending, harassing, retaliating, and violating the terms and conditions of his employment on November 2, 2020[1].

2. The Commission does not have jurisdiction over OSHA claims nor allegations of retaliation for OSHA whistleblowing.[2]

3. In or around October 28, 2020 the Complainant, a transit bus driver for Respondent, was notified by dispatcher Ron Boucher ("Boucher") (Venezuelan) that he was not allowed to use the dispatch bathroom while on duty. Boucher alleged he was instructed this by either Asst Director/Operations Manager Beverly Garofola ("Garofola") (White/Caucasian) or Executive Director Henry Jadach ("Jadach") (White/Caucasian).  The Complainant spoke to Garofola about this issue. Around this time, Complainant also became aware his schedule changed and that his shift would end at 1:00pm instead of 11:00am for the following week.

4. There is a discrepancy regarding whether Complainant had a medical appointment scheduled for November 2, 2020 and whether Complainant notified Garofola about the medical appointment. This investigator finds there's at least reasonable cause that both are true.   Complainant testified that he had an appointment at 1:15pm in Fairfield. Complainant's witness and Union President Mustafa Salahuddin ("Salahuddin")

---

[1] All allegations are dated for November 2, 2020, except for harassment. The alleged harassment period is October 20, 2020, to November 2, 2020.

[2] Complainant alleges that between September 2020 to November 2020 the Respondent lied to OSHA regarding who was sanitizing buses. Complainant also alleges that his schedule was changed shortly afterwards as retaliation for declining to work extra hours to sanitize buses because he wanted to remain "neutral" regarding the OSHA issue.

2

(Black/African American) testified that he received a doctor's letter from Complainant afterwards. Of note is that the appointment is a 15-minute drive from Milford. This, along with Complainant's testimony that he was prompted by the schedule change to 1:00pm makes it credible that he did notify Garofola orally. Testimony indicates Complainant did not show Garofola an appointment card nor complete any forms to ensure he would not be scheduled after 1:00pm on November 2, 2020.

5. On November 2, 2020 Complainant was originally scheduled for the Route[3] shift 5:45am to 1:00pm. During the beginning of Complainant's shift, Garofola learned the 2nd shift driver (12:30pm – 7:15pm), Brian Harris ("Harris"), was sick and needed coverage. Garofola found some coverage but needed Complainant to stay until 3:00pm. It is of note that another driver, Val Morton also called out sick.

6. At least by 11:00am Complainant was aware that he was needed. There is discrepancy regarding what was said over the dispatch radio between Complainant and Garofola. What at least is certain is that Complainant stated he would not stay past 1:00pm because he had a medical appointment. Complainant returned the bus around 1:00pm.

7. Garofola subsequently found coverage at 2:00pm. Complainant only needed to stay for 1 more trip[4] and he would have been relieved.

8. Prior to 1:00pm, Garofola issued a notice in Complainant's mailbox that he was suspended "for the rest of this week". Garofola charged that Complainant violated the Personnel Policy[5]due to his failure to remain on duty until properly relieved and for insubordination[6]. Complainant notes the letter was written prior to him returning the bus at 1:00pm. While Complainant alleges this is evidence of discriminatory conduct, this Investigator does not agree. Garofola was clearly aware that Complainant did not intend to stay until 3:00pm, further evidenced by the fact Complaint did in fact park the vehicle in Respondent's lot at 1:00pm.

9. The Complainant immediately spoke to Garofola. There is a significant discrepancy regarding what was said. This investigator finds it more likely than not that the Complainant was asked

---

[3] Testimony indicates route shifts drive transport buses and are shorter shifts than van shifts.

[4] Testimony indicates one trip is equal to one hour.

[5] See *Page 27, Category II violations*. These violations warrant either discharge or suspension for the first offense.

[6] Garofola testified it was insubordinate to refuse a supervisor's order over the dispatch radio.

whether he wanted to quit, and Complaint orally indicated he did.  While Complaint's and Garofola's testimony is in direct contradiction, this Investigator relied on the testimony of Complainant's witness Salahuddin. Salahuddin testified that he asked Complainant afterwards if he quit, and Complainant confirmed he did[7]. Furthermore, based on Garofola's testimony, she had the discretion to terminate Complainant for the alleged violations. It is not credible that Garofola chose to suspend Complainant and then immediately tried to either terminate Complainant or get Complainant to quit.

10. Prior to November 2, 2020, both the Complainant and the witnesses agree that Complainant did not object to any of Respondent's actions on the grounds that he was being discriminating against based on his Hispanic heritage. The parties further agree that Complainant did not allege discrimination until he filed with the Commission on February 2, 2021. Therefore, there is no reasonable cause to believe Complainant was retaliated against on November 2, 2020.

11. Complainant articulated (2) actions[8] during the period of October 20, 2020, to November 2, 2020, that might be categorized as harassment. This investigator finds there's no reasonable cause to believe these actions were discriminatory based on Complainant's Hispanic heritage.  Complainant first articulated that his schedule was changed in late October of 2020. Complainant alleges this was due to him resisting an OSHA dispute. Complainant secondly articulated that he was denied access to the dispatch's bathroom. However, Complainant testified that other Hispanic employees used the dispatch bathroom. Furthermore, Respondent articulated a credible non-discriminatory reason. Garofola testified that the dispatch bathroom was "out of the way" and that Complainant was falling behind on his route.

12. The overriding text to determine whether Complainant's November 2, 2020, suspension was out-of-line, which could lead to an inference of discrimination is the Collective Bargaining Agreement[9] ("CBA"). Specifically, Article 19, Sections A[10] and B[11].  Respondent argues that

---

[7] Exact testimony: I asked him, "did you quit?" He said, "...I was upset when she asked me if I quit. I said sure. Then she asked me to put it in writing."

[8] Besides the suspension/termination/resignation on November 2, 2020.

[9] CBA dated August 14, 2020.

[10] "All operators are required to make at least one complete trip when a relief driver does not show up on time."

[11] Relevant text (summarized): When relief does not show for whatever reason, the shift will be offered to the driver with the most seniority that is available to work the shift. If the senior driver available refuses to work the shift, it will be covered by the least senior driver available.

violation of either article satisfies Section IX of Respondent's Personnel Policies[12] and therefore Complainant's suspension was neither improper nor discriminatory.

13. Based on the CBA, negotiated between the Respondent and Complainant's Union, it was the Complainant's duty to complete at least one trip [13] when coworker Harris called out sick. Complainant should have been aware of this possibility when his schedule was changed in late October 2020.

14. There is also the issue of whether Complainant was obligated to complete Harris's shift, and whether this requirement was discriminatory. This Investigator does not find reasonable cause to believe this obligation was discriminatory. The obligation is based solely on Complainant's Union's CBA.

15. The first issue is what employees are considered "available", and therefore which employees are in the pool to determine seniority. There is a discrepancy regarding this interpretation. This Investigator finds that "available" generally includes employees already working that day who have not been expressly given time off. It seems employees who are not scheduled for the day and have a legitimate reason are excluded[14].

16. The second issue is whether Complainant followed the proper procedure to make himself unavailable. Based on the testimony, it is doubtful Complainant followed the proper procedure. While it is likely Complainant orally told Garofola in advance, he did not fill out nor provide any paperwork to exclude himself. All witnesses agree that paperwork is typically completed to make oneself unavailable. Complainant argued forms were only needed if it was for a day he was already scheduled. Garofola testified that paperwork is always required, at the very least, an appointment card is necessary. This Investigator found Complainant's witness Salahuddin's testimony most relevant. Salahuddin stated that paperwork is always required, regardless of whether an employee orally tells management beforehand.

17. The third issue is whether Complainant was the least senior driver at the time, and thus obligated to complete Harris's shift. There are (2) possible interpretations, neither of which leave any possibility for discrimination based on Complainant's Hispanic heritage. It is most

---

[12] See *Category II Violations* – "1st Offense – Discharge or Extended Suspension...c) Insubordination...h) Failure to remain on duty until properly relieved."

[13] Estimated to last 1 hour.

[14] Testimony indicated that legitimate reasons were interpreted broadly. Among others, one example given was if coverage was needed in an hour and employee lived an hour away, he would be excluded.

likely that Complainant was the least senior available driver, therefore his refusal to cover the shift violated the CBA and Respondent's Personnel Policies. However, it is also possible that Eric Rodriguez ("Rodriguez") was the least senior driver available[15]. Since the parties identified Rodriguez as being of Hispanic descent, it does not logically follow that Garofola's determination that Complainant was the available driver was at all based on Complainant's Hispanic heritage. Garofola also articulated a credible non-discriminatory reason for not using Rodriguez. Based on her understanding of the CBA, Rodriguez would've been required to be paid for a 4-hour shift even if he was only working an extra hour or two.

18. Complainant did not articulate any changes to his terms and conditions of employment on November 2, 2020, except what has already been mentioned.

19. For the reasons stated above and considering the totality of the evidence gathered, the Investigator finds there is no reasonable cause to believe that the Respondent discriminated against the Complainant on the basis of his race (Hispanic), color (Hispanic), and previous opposition to discriminatory conduct.

## DETERMINATION

☐  After reviewing all of the evidence in the Commission's file, the Investigator concludes there is **reasonable cause** for believing that a discriminatory practice has been or is being committed as alleged in the complaint.

☒  After reviewing all of the evidence in the Commission's file, the Investigator concludes that there is **no reasonable cause** for believing that a discriminatory practice has been or is being committed as alleged in the complaint.

---

[15] Per the driver roster, only 3 others were originally scheduled for November 2, 2020, and didn't have a conflicting schedule. Angel was the most senior of the (4) with 14 years' experience. First was Eric Rodriguez (11 years), Rodriguez worked the am shift, Rodriguez ended his shift prior to Garofola learning that Complainant would not work past 1:00pm. Bey Gershom (2 ½ months), at the time, Gershom's shift was already extended to 2:15pm. Lastly was Joseph Bonaparte (8 years), Bonaparte was already coming in early to cover one of the shifts at 1:00pm.

Dated and entered this __15th__ day of __December,__ 2021.

Christopher Blustein
CHRO Investigator
**Commission on Human Rights and Opportunities**

## COMMISSION ON HUMAN RIGHTS  & OPPORTUNITIES

ANGEL COLLAZO                                                    CHRO:  2130341

V.

MILFORD TRANSIT

### CLAIMANT'S REPLY TO MILFORD TRANSIT'S ANSWER TO COMPLAINT

I am an individual of Hispanic descent.  I was employed with the Respondent for over fourteen (14) years.  Throughout those fourteen years of employment, I have consistently been subjected to disparate and differential treatment on the basis of my race.  More recently, this disparity was demonstrated wherein I was singled out and ultimately terminated from my employment when the Respondent held me to a different standard as compared to my Caucasian and African American peers.  This is demonstrated as  follows:

The Respondent begins by indicating that for the week of Monday, November 2, 2020 to Friday, November 6, 2020, I was scheduled to work Monday through Friday starting from 5:45 a.m. to 1:00p.m. (Ex. 2). That schedules are posted by Wednesday of the preceding week and if a driver does not want to work available extra hours due to an appointment, s/he is required to notify the Operations Manager who will take it into account on the schedule.  Further providing "The Complainant had not so notified the Operations Manager that he had a pre-scheduled doctor's appointment on November 2, 2020, even though he had done so in the past." Respondent appears to be attempting to make it appear to this Commission that I failed to schedule time off for a previously scheduled doctor's appointment.  As alleged in the Complaint however, the week prior to my scheduled Doctor's appointment I did speak with Beverly Garofola. Ms. Garofola advised me that my schedule was being changed from an 11:00 a.m. departure to a 1:00 p.m. departure for the upcoming week.  I advised Ms. Garofola that I had a doctor's appointment scheduled for the following week, but the 1:00 p.m. departure would be okay.  As stated by the Respondent the week of Monday, November 2, 2020 to Friday, November 6, 2020, I was scheduled to depart the facility at **1:00 p.m.**  As further admitted by the Respondent, on November 2, 2021, Ms. Garofola was attempting to find **coverage** - I was on the schedule only until 1:00 p.m. that day.  Therefore, despite having already notifying Ms. Garofola of my doctor's appointment the previous week, there was no requirement and/or need for me to notify Ms. Garofola of my scheduled doctor's appointment and/or to schedule time off from work to attend that appointment.  Furthermore, there is no policy, procedure or indication within the Collective Bargaining Agreement that I am required or mandated to notify the Respondent when I am unavailable for **extra hours.**

Respondent next attempts to set forth that I had somehow acted insubordinate in responding to the Respondent's request for me to work additional hours.  Respondent sets forth that I did not respond to a text message regarding performing the extra hours.  Yet Respondent was well aware that I did not have a cell phone and that usage of a cell phone during working hours was against Respondent policy.  Next Respondent alleges that I was screaming on the radio that I would not stay beyond my scheduled shift.  This however is not what was reported by Ms. Garofola to the Union.  In an email by Ms. Garofola dated November 2, 2020 at 1:34 p.m. Ms. Garofola indicated to the Union "I have attached a notice to Angel Collazo briefly stating what was said over the bus radio this morning."  That document speaks for itself and sets forth that at no time did Ms. Garofola alleged that I yelled on the radio.  That document indicates that upon Ms. Garofola notifying me at 11:00 a.m. that I was needed to work late, my response was "I told you I had an appointment today that I cancelled before, I'm not staying.  I'll park the vehicle in the back.'  That notification further goes on to indicate that my response resulted in me violating Personnel Policy, page 27, Category II violations for being insubordinate and failing to remain on duty until properly relieved.  Of significant importance however demonstrating a strong inference of pretext is that my shift did not end that day until 1:00 p.m. *Outside of simply notifying my supervisor that I was not available to stay late that day, I had not committed any wrongdoing.*  Ms. Garofola indicates in her communication to the Union that at 11:00 a.m. that morning, upon my notice to her that I could not work late that day, she charged me with insubordination for not remaining on duty until properly relieved, issued me a disciplinary letter and suspended me for four (4) days.  Of utmost importance however, is that at 11:00 a.m. I was still on the road completing my route.  I did not return back to the facility until 1:00 p.m.  Upon my return to the facility, Ms. Garofola already had my suspension letter in my mailbox.  Common sense dictates that I could not have reasonably committed any act of insubordination of failing to remain on duty, because that letter was in my mailbox ***prior to my return.***  I was still on duty at the time of finding that letter in my mailbox, I further had not left the facility.  Given Ms. Garofola's own written communication and version of events as outlined in Exhibit 1, it is evident that Ms. Garofola's version of events is not credible.  This raises further questions as it pertain to Ms. Garofola's version of events that I had "quit" my job.  Because at no time did I notify Ms. Garofola that I was not returning *or that I had quit.  In fact, upon returning back to the facility at 1:00 p.m* - That letter of suspension was already present in my mailbox.  Upon seeing what the letter stated, I spoke with Ms. Garofola and asked her "what is this?  Are you doing that favoritism thing again?  Are you looking for my resignation?"  Ms. Garofola's response was "Yes, I will accept it."  I did not respond to Ms. Garofola and simply left the facility.  At no time did I make any statement or comment to Ms. Garofola about quitting my job or not returning to my job, that is simply untrue.

Respondent next sets forth an argument regarding an alleged violation of the collective bargaining agreement.  Respondent indicates that:

> Article 19, Section C of the collective bargaining agreement (Ex. 1) governing the Complainant's terms and conditions of employment states:
>
> When a relief does not show for whatever reason the shift will be offered to the driver with the most seniority that is available to work the shift[. If] the senior driver(s) who are available refuse the work the shift will be covered by the least senior driver(s) available. Failure to do so will be considered insubordination and dealt with as outlined in the progressive discipline policy category II Violations of the [Personnel] Policy of the District.

Respondent argues that because the afternoon shift driver had called out sick on the morning of November 2, Ms. Garofola engaged another driver to cover. However, that driver was not available until 3:00 p.m.  The Respondent does not indicate who that "other" driver was, but presumably that other unavailable driver who turned down working hours, was not written up for insubordination and suspended for four days, like I was?   Respondent goes on to state "As the least senior driver available that day, and as one who was already assigned to drive the route, Ms. Garofola asked the Complainant to work two additional hours until he could be relieved from duty at 3:00 p.m."  The key word in the above sentence is that Ms. Garofola "asked" the Complainant to work the additional hours.  That simply is because Respondent's version of events as written are yet again, not credible.  For instance, the collective bargaining agreement indicates when the most senior driver is not available, the shift will be covered by the *least senior* driver(s). Respondent then alleges that I was the least senior driver who was available that day.  This too is untrue.  A list of seniority is attached as Exhibit 2.  A list of the scheduled drivers on November 2, 2020, is attached as Exhibit 3.

A review of the November 2, 2020, schedule indicates the following individuals were available for coverage:

| | | | |
|---|---|---|---|
| Val | 5:45 a.m. to 1:30 p.m. | (Most senior) | (could have stayed until 3:00 p.m.) |
| Joe | 3:15 p.m. to 9:30 p.m. | (less senior) | (could have come in at 1:00 p.m.) |
| Gershom | 5:45 a.m. to 11:30 a.m. | (not on list) | (could have come back at 1:00 p.m.) |
| Eric | 5:45 a.m. to 11:00 a.m. | (less senior) | (could have come back at 1:00 p.m.) |

Based on Respondent's own policy, the most senior, Val, if declining the additional hours, the policy dictates that it then reverts to the least senior individual. That individual based on the seniority list would have been Eric. Eric was only scheduled to work until 11:00 a.m. on the morning of November 2, 2020. Eric was the individual, according to contract, who was required to take on the additional hours. Eric, an African American, less senior employee, was not cited for insubordination or suspended for failing to cover mandated hours. The next less senior individual was Joe, a Caucasian individual. Joe was less senior than I. Joe was not cited for insubordination or suspended for failing to cover mandated hours. The last individual is Gershom, an African American employee who is not on the seniority list. Gershom was only scheduled to 11:30 a.m. on the morning of November 2, 2020, Gershom, as a less senior employee, could have been mandated to cover the available hours. Gershom was not cited for insubordination or suspended. The only individual who was singled out, treated differently, cited for insubordination, suspended and ultimately terminated was the Hispanic, 14 year employee. Lastly, it should be noted by this Commission that in the past, when coverage has not been attainable by the Respondent, other non-Hispanic drivers have simply been told to bring in the bus and just park it. This has occurred on several occasions, especially with Mike, a Caucasian weekend operator.

Furthermore, pursuant to the collective bargaining agreement, I could not have been cited for insubordination for refusing a change in working hours. Article 19 (A) provides that any change in hours requires the Respondent to provide a 48 hour notice period. Article 6, Section 1, further sets forth that an investigation is to occur prior to any issuance of discipline. I was not provided with 48 hours notice and no investigation occurred prior to the Respondent notifying me of a four (4) day suspension.

## OSHA Violation

While it is true that this Commission does not have jurisdiction over OSHA violation, it does have jurisdiction over retaliation claims regarding employees speaking out about various terms and conditions of employment that may qualify under anyone of the protected classes. In the present matter, I was the employee who was requested to work overtime hours to sanitize and clean the buses. Despite Respondent's suggestion that all employees were performing this task, I was the only employee performing that task. At that time, the Respondent was not providing proper protective gear. No masks, sanitizer or appropriate cleaning products were being provided by the Respondent. This became a collective concern of all the drivers to which on April 20, 2020, the Union filed a notice of alleged safety and health hazard with OSHA. On April 24, 2020, the Union filed a collective grievance on behalf of all Respondent operators with the Board of Labor Relations. Given the severity of Covid-19 and

the significant health risks involved, a complaint regarding the health of employees and a reasonable request for an outside vendor to perform sanitation could reasonably qualify, or be perceived as a valid request for a reasonable accommodation under the ADA. Following the above events, I was retaliated against. On June 10, 2020, the Respondent was cited by OSHA. Following that citation, Respondent began to single me out as a result of that filed complaint and resulting violation. At that time, management at Milford Transit provided false information to the OSHA investigator wherein it reported that I was not cleaning the buses, I was only supervising the two employees they had hired to clean the buses, despite being fully knowledgeable that I was cleaning the buses for several weeks. Following that OSHA inquiry, in November, 2020, the second shift driver relieved me at 11:00 a.m. I was then approached by my manager and asked if I would come in late in the afternoon to clean the buses. As a result of the meeting with OSHA, I told Mr. Jadach I wanted to stay neutral and I did not want to get involved and declined the assignment. I was then notified that there was an error with the schedule that day (do to no fault of my own), and I was supposed to be scheduled until 1:00 p.m. and not 11:00 a.m. I believe I was being retaliated against wherein my schedule was now changed without any notice from management from my normal departure time at 11:00 a.m. I was then advised by the dispatcher that I was no longer allowed to stop at dispatch to use the bathroom facilities. I was the only employee singled out and told I was not allowed to utilize the bathroom at the facility. This led to the false and fabricated termination of my employment on November 2, 2020.

Last, but not least, in further retaliation, I was recently notified by my present employer that upon making contact with the Respondent to gain a reference on me for employment with them, the Respondent engaged in blacklisting, by providing my current employer with false and misleading accusations. This can be verified by the Union President, because following that defamatory and negative reference, my present employer inquired with the Union President to clarify the matter.

## Conclusion

As demonstrated above, the Commission does not lack jurisdiction over my OSHA retaliation claims - because they are claims that are covered under state and federal disability/accommodation laws. As it relates to my disparity and unequal treatment claim based on my race, significant credibility issues exist regarding why I was singled out, treated differently and held to a different standard as compared to my non-Hispanic peers. At no time did I violate any Respondent policy or procedure. At no time was I insubordinate or in violation of Respondent policies. Respondent's actions of classifying a denial of non-mandatory work hours as grounds for a claim of insubordination and/or a four (4) day suspension is highly

suspect.  This is heightened by the fact that other non-Hispanic operators who were by contract required to cover those hours, were not classified as insubordinate, suspended or terminated from their employment.  The Respondent, as alleged further has not demonstrated that the District's personnel rules and collective bargaining agreement establish a legitimate, non-discriminatory reason for issuing discipline to the Complainant for refusing to work until his relief showed up.

As such, I respectfully request that the Commission retain this present matter for full investigation.


Sincerely,
Angel Collazo

## Commission on human rights and opportunities

I Mike Schiff former part time employee of Milford transit district from January 2006 to February 2021 cannot attend the phone meeting on December 9th for this reason I'm a bus operator Norwalk bus company. Law and company policy. Prevent us from using cell phone while operating company vehicles. Also, I have no vacation or personal days in the near future. I am willing to testify, but my job and working hours make it difficult to attend. So, I am submitting my home number is 203-929-7048 cell number IS 203 906 4959 please leave a detailed message identifying yourself and I will return your call as earliest at my convenience and answer any questions that you may have. Pretending to this case. I discussed this case with Mr. Collazo inform him. That I did bring the bus back numerous times without. Proper relief and never was disciplined for this. I will testify this to the Commissioner once they call. And any other concerns that the Commission may have? I will answer it honesty and the best of my knowledge.

Thank you very much, sincerely

Yours Mike Schiff

**COMMISSION ON HUMAN RIGHTS  & OPPORTUNITIES**

ANGEL COLLAZO                                          CHRO:  2130341

V.

MILFORD TRANSIT

### CLAIMANT'S REPLY TO MILFORD TRANSIT'S ANSWER TO COMPLAINT

I am an individual of Hispanic descent.  I was employed with the Respondent for over fourteen (14) years.  Throughout those fourteen years of employment, I have consistently been subjected to disparate and differential treatment on the basis of my race.  More recently, this disparity was demonstrated wherein I was singled out and ultimately terminated from my employment when the Respondent held me to a different standard as compared to my Caucasian and African American peers.  This is demonstrated as  follows:

The Respondent begins by indicating that for the week of Monday, November 2, 2020 to Friday, November 6, 2020, I was scheduled to work Monday through Friday starting from 5:45 a.m. to 1:00p.m. (Ex. 2). That schedules are posted by Wednesday of the preceding week and if a driver does not want to work available extra hours due to an appointment, s/he is required to notify the Operations Manager who will take it into account on the schedule.  Further providing "The Complainant had not so notified the Operations Manager that he had a pre-scheduled doctor's appointment on November 2, 2020, even though he had done so in the past." Respondent appears to be attempting to make it appear to this Commission that I failed to schedule time off for a previously scheduled doctor's appointment.  As alleged in the Complaint however, the week prior to my scheduled Doctor's appointment I did speak with Beverly Garofola.  Ms. Garofola advised me that my schedule was being changed from an 11:00 a.m. departure to a 1:00 p.m. departure for the upcoming week.  I advised Ms. Garofola that I had a doctor's appointment scheduled for the following week, but the 1:00 p.m. departure would be okay.  As stated by the Respondent the week of Monday, November 2, 2020 to Friday, November 6, 2020, I was scheduled to depart the facility at **1:00 p.m**.  As further admitted by the Respondent, on November 2, 2021, Ms. Garofola was attempting to find ***coverage*** - I was on the schedule only until 1:00 p.m. that day.  Therefore, despite having already notifying Ms. Garofola of my doctor's appointment the previous week, there was no requirement and/or need for me to notify Ms. Garofola of my scheduled doctor's appointment and/or to schedule time off from work to attend that appointment.  Furthermore, there is no policy, procedure or indication within the Collective Bargaining Agreement that I am required or mandated to notify the Respondent when I am unavailable for ***extra hours.***

CSE 3:22-cv-01006-SVN   Document 1-1   Filed 08/08/22   Page 22 of 30

Respondent next attempts to set forth that I had somehow acted insubordinate in responding to the Respondent's request for me to work additional hours. Respondent sets forth that I did not respond to a text message regarding performing the extra hours. Yet Respondent was well aware that I did not have a cell phone and that usage of a cell phone during working hours was against Respondent policy. Next Respondent alleges that I was screaming on the radio that I would not stay beyond my scheduled shift. This however is not what was reported by Ms. Garofola to the Union. In an email by Ms. Garofola dated November 2, 2020 at 1:34 p.m. Ms. Garofola indicated to the Union "I have attached a notice to Angel Collazo briefly stating what was said over the bus radio this morning." That document speaks for itself and sets forth that at no time did Ms. Garofola alleged that I yelled on the radio. That document indicates that upon Ms. Garofola notifying me at 11:00 a.m. that I was needed to work late, my response was "I told you I had an appointment today that I cancelled before, I'm not staying. I'll park the vehicle in the back.' That notification further goes on to indicate that my response resulted in me violating Personnel Policy, page 27, Category II violations for being insubordinate and failing to remain on duty until properly relieved. Of significant importance however demonstrating a strong inference of pretext is that my shift did not end that day until 1:00 p.m. Outside of simply notifying my supervisor that I was not available to stay late that day, I had not committed any wrongdoing. Ms. Garofola indicates in her communication to the Union that at 11:00 a.m. that morning, upon my notice to her that I could not work late that day, she charged me with insubordination for not remaining on duty until properly relieved, issued me a disciplinary letter and suspended me for four (4) days. Of utmost importance however, is that at 11:00 a.m. I was still on the road completing my route. I did not return back to the facility until 1:00 p.m. Upon my return to the facility, Ms. Garofola already had my suspension letter in my mailbox. Common sense dictates that I could not have reasonably committed any act of insubordination of failing to remain on duty, because that letter was in my mailbox *prior to my return.* I was still on duty at the time of finding that letter in my mailbox, I further had not left the facility. Given Ms. Garofola's own written communication and version of events as outlined in Exhibit 1, it is evident that Ms. Garofola's version of events is not credible. This raises further questions as it pertain to Ms. Garofola's version of events that I had "quit" my job. Because at no time did I notify Ms. Garofola that I was not returning or that I had quit. In fact, upon returning back to the facility at 1:00 p.m - That letter of suspension was already present in my mailbox. Upon seeing what the letter stated, I spoke with Ms. Garofola and asked her "what is this? Are you doing that favoritism thing again? Are you looking for my resignation?" Ms. Garofola's response was "Yes, I will accept it." I did not respond to Ms. Garofola and simply left the facility. At no time did I make any statement or comment to Ms. Garofola about quitting my job or not returning to my job, that is simply untrue.

Respondent next sets forth an argument regarding an alleged violation of the collective bargaining agreement.  Respondent indicates that:

> Article 19, Section C of the collective bargaining agreement (Ex. 1) governing the Complainant's terms and conditions of employment states:
>
> When a relief does not show for whatever reason the shift will be offered to the driver with the most seniority that is available to work the shift[. If] the senior driver(s) who are available refuse the work the shift will be covered by the least senior driver(s) available. Failure to do so will be considered insubordination and dealt with as outlined in the progressive discipline policy category II Violations of the [Personnel] Policy of the District.

Respondent argues that because the afternoon shift driver had called out sick on the morning of November 2, Ms. Garofola engaged another driver to cover. However, that driver was not available until 3:00 p.m.  The Respondent does not indicate who that "other" driver was, but presumably that other unavailable driver who turned down working hours, was not written up for insubordination and suspended for four days, like I was?   Respondent goes on to state "As the least senior driver available that day, and as one who was already assigned to drive the route, Ms. Garofola asked the Complainant to work two additional hours until he could be relieved from duty at 3:00 p.m." The key word in the above sentence is that Ms. Garofola "asked" the Complainant to work the additional hours.  That simply is because Respondent's version of events as written are yet again, not credible.  For instance, the collective bargaining agreement indicates when the most senior driver is not available, the shift will be covered by the *least senior* driver(s).  Respondent then alleges that I was the least senior driver who was available that day.  This too is untrue.  A list of seniority is attached as Exhibit 2. A list of the scheduled drivers on November 2, 2020, is attached as Exhibit 3.

A review of the November 2, 2020, schedule indicates that driver were available for coverage:

| | | | |
|---|---|---|---|
| Driver 1 | 5:45 a.m. to 1:30 p.m. | (Most senior) | (could have stayed until 3:00 p.m.) |
| Driver 2 | 3:15 p.m. to 9:30 p.m. | (less senior) | (could have come in at 1:00 p.m.) |
| Driver 3 | 5:45 a.m. to 11:30 a.m. | (not on list) | (could have come back at 1:00 p.m.) |
| | 5:45 a.m. to 11:00 a.m. | (less senior) | (could have come back at 1:00 |

Prior to my termination. Read this very carefully.

The 2nd shift driver relieved me at 11:00 o'clock. As I went back to the office. Executive Manager was standing there. He approached me and asked me, do I know, do I want to come in this evening and work extra hours? Meaning do I want to clean the buses? I said to him, I really don't want to get involved. This angered him. I get a call from dispatch as I was going home. And dispatcher tells me that I was supposed to get out at 1:00 o'clock not at 11:00 o'clock. I said well why you telling me this? Why you just singling  me out. He says that that the executive manager Henry Jadach looked at the schedule and found that you were supposed to get out at 1;00 that upset him. The very next day. This second shift driver came at 11:00 o'clock. I am forming him to call the office and find out what time he is supposed to relieve me. He caused the office. The office said. That Angel is to stay till 1:00 o'clock. I found this very disturbing. In also. The dispatcher tells me I am not to use the bathroom. And then. Dispatch tells me go see the manager. So that's when I went inside the manager's office Ms. Garofalo I ask her why can't I use the bathroom and she reply that it annoys Henry. She also said that she needed to change the schedule next week to 1:00 o'clock. I said to her, well, that's fine, but I do have a doctors appointment and she said, well, you always make your doctors appointment after 1:00 o'clock I said yes, I do believe is after 1:00 o'clock she was very, very well aware that I had an appointment that very week and this she cannot deny

Response . That very day November 2nd I contacted Union Steward and I explained to her what happened. She arranged a meet for November 6 3;00 Ms. Garofalo Mr. Henry Jadach Union Stewart and me. Mr. Jadach asked me to tell him the truth, so I did. I explained to him that she was very aware that I had an appointment. He went on by saying, well, if you could come here. To use the bathroom, you could certainly use the telephone to cancel out your appointment and or you could have asked one of the passengers if you could borrow their cell phone to cancel out your appointment. He continued by saying that he saw some of the text that send.to MS Garofalo , indicating that I was acting very rude and very nasty to her. my reply to him was can we see the text He produced nothing. Mr. Jadach wanted to make sure that I was fired and that I stay fired. Meeting was over the union steward contacted the president of the union he arranged a meeting for November 10th, there was another meeting. I was ask to step out of the room when the meeting was over. The Union president advised me. To apply for unemployment. They are not interested in my employment Nor was I given unused vacation pay.. Ms. Garofalo does not do the actual termination its Mr. Jadach who has the last say Speaking of Mr. Jadach  he's not mention nowhere in this response so there's something wrong here that needs to be investigated. Furthermore, Milford Transit does not have public radio's that's just a myth completely false.

FAX NUMBER 475 221 2264


ATT; MICA PLEASE FORWARD

TO CHRO MR BLUSTEIN


Commission on Human Rights and Opportunities.        12/27/2021


I Angel, Collazo CHRO number 2150341 I am writing this document on my own behalf regarding the meeting that took place on December 9th. There were some issues that I need to make clear. I also attach a letter from the Union so the CHRO could better understanding clearly about what the President was testifying during the meeting. How union choose cases? That's just something that I like the CHRO to read and better understand. Please take a little time to read attached letter.

The first question that the investigator asked of me was Defamation of character. What do I mean by that? At the time I was. Confused and really didn't want to answer that question. Then the subject of Mike Schiff happens to be one of my witnesses came up. I recall saying that Mike Schiff always granted Easter off then the investigator asked me do you get Easter off and I reply yes, I do. However, there's a difference here. Easter always falls on a Sunday. I was a full-time worker. I work from Monday through Friday, so there would be no need for me to put in a request to have the day off. However, Mike Schiff works the weekends has to put in a request to take the day off. His request is always granted if the investigator asked me whether I get my birthday off. Well, you probably would have gotten a different answer.


Then I heard the investigator say something to the effect of did you put him up to doing this? I was wondering what the investigator was talking about. But as the respondent began talking about Mike how he hung up on her. Then his wife, called and say Mike quit his job? Well, that's very. Evening. I call Mike and left a message for him to return my call and he did. I questioned him and informed him

that the responded said that your wife had said that you quit your job. Well, I get a different story. But who works for Milford Transit here anyway? Mike or his wife? She surely didn't hear it directly from Mike that he quit. Or was he fired? That's a mystery here. When the meeting was over, I contacted attorney Bruce assistant. So I asked her what does he mean by did you put him up to writing this. I didn't understand. So she sent me a copy of this letter that Ron Boucher supposedly have wrote. When I started to read that letter. I was in deep shock and in pain. How did they get a 70- or 75-year-old man to do such a thing? Why couldn't they just let him? Resign, quit or retire. And she did it under oath, so what other lies she is telling. It is completely, totally fake. It wasn't introduced back in November during a union company grievance. I also notice that they had. Him as a witness, but maybe next to his name. I also called the Union President who is my other witness and asked him, have you ever seen this letter? He never saw this letter before and neither did the Union steward, who was representing me. And now after seven months they come up with this. I am not going to take this very lightly and I hope the CHRO will do something about this. Lying to a state agency, you figured that's something very, very serious. But that's not the first time they lied They also lied to OSHA. I'd like to personally thank Christopher Blustein for bringing this letter up to the surface. And why are they always insisting that I voluntarily quit when you can see the evidence that I put in a grievance? We worked all the steps and they kept saying no, they didn't want me to worked there  anymore We did the first and the second step, and we also were going to arbitration. Are they thinking the CHRO is going to dismiss this case because they said that I voluntarily quit?

As I said before, where is manager Mr. Henry Jadach He's the one who really does the actual termination. As for Ron Boucher the one who wrote that fake letter? Why would he do such a thing? Now about the Defamation of Character Mr. Blustein. Just read that fake letter and listen to the last testimony. I hope that answers your question.

Respectfully submitted.

Commission on Human Rights and Opportunities.

I Angel, Collazo CHRO number 215-0341. I am writing this document on my own behalf regarding the meeting that took place on December 9th. There are some issues that I need to make clear. I also attach a letter from the Union so the CHRO could better understand clearly about what the President was testifying during the meeting. How unions choose cases? That's just something that I like the CHRO to read and better understand. The first question that the investigator asked of me was Defamation of Character. What do I mean by that? At the time I was confused and really didn't want to answer that question. Then the subject of Mike Schiff, who happens to be one of my witnesses, came up. I recall saying that Mike Schiff always granted Easter off. Then the investigator asked me do you get Easter off and I replied yes. I do. However, there's a difference here. Easter always falls on a Sunday. I was a full-time worker. I work from Monday through Friday, so there will be no need for me to put in a request to have the day off. However, Mike Schiff works the weekends has to put in a request to take the day off. His request is always granted. If the investigator asked me whether I get my birthday off, well, you probably would have gotten a different answer.

I heard the investigator. Say something to the effect of did you put him up to doing this? I was wondering what the investigator was talking about. But as the responder began talking about Mike. How he hung up on her? Then his wife sometime later called up and Said Mike quit his job. Well, that's very evening. I call Mike and left a message for him to return my call and he did. I questioned him and I informed him that the respondents said that your wife has said that you quit your job. Well, I get a different story. But who works for Milford Transit here anyway? Mike or his wife? She surely didn't hear it directly from Mike that he quit. Or was he fired? That's a mystery here. When the meeting was over, I contacted attorney Bruce assistant, so I asked her what does he mean by did you put him up to writing this. It didn't understand, so she sent me a copy of this letter that Ron wrote. When I started to read that letter, I was in deep shock and pain. How did they get a 70 or 75 year old man to do such a thing? Why couldn't they just let him

So, true to the fact I did collect unemployment and true to the fact. That they were notified by the Department of Labor, they did not appeal, or contested. and as you can see. I didn't **voluntarily quit. I was terminated and I was terminated by Mr.Jadach.** And still, that does not erase the fact that they discriminate against me, and every sense of the word, and retaliated against me There were other times that I felt extremely uncomfortable about how they treated me and treated others. But this time they went too far. At this time, I will not provide any names

An investigation is very needed at this time, so I'm asking the Commission to please grant me an investigator to investigate this matter, because I truly believe that I was discriminated, retaliated, hate... humiliated in. Every sense of the word.

To the commissioner and staff. I plead to you provide me with full investigation. I will provide documents. And I could provide witnesses that will come forward; to testify. That these events truly happen. That I was a victim of discrimination, retaliated, humiliated. In every sense of the word. Therefore, I am asking. For an investigation... I would fully and truly. Cooperate and bring forward witnesses and documents to prove it and I can also provide doctor's appointment. document Their reply full of false allegations.

The responded need to use extreme caution about referrals on any formal employee Defamation of character. Gambardella v Apple Health care Please advise your client upon this matter. About the OSHA investigation Mr. Jadach report.to OSHA that I was only supervising the cleaning of the buses when in fact and they know very well that I was doing just more than that. I was cleaning the buses why would they reported this completely false. And they know it. When I refused to clean the buses that date that he asked me, that is when he really started retaliating against me.

Respectively submitted.

Angel Collazo

Collazo

Vs

Milfort Transit District

Case number 2130341



2/7/2022

My name is Angel Collazo case number 2130341 I am 65 years of age. My residency is 824 Wood Ave apt. 2 Bridgeport CT.06604 I am a blue-collar worker. I don't have a secretary or an office I do not have any of these luxuries. I drive a public service bus. I work. For the Greater Bridgeport Transit Authority, I am Writing this letter to the Commissioner to please reopen this case for these reasons. I've never received any letter from the Commission on human rights and opportunities. Nor did they never contact me by email nor by letter Regarding my case. However. I did attend the December 9th video recording which. I only have a cell phone and a 4-inch tablet. Which left me in disadvantage.my cell phone kept dropping the call my tablet wasn't functioning and I was also using my neighbors Wi-Fi. During the interview. I was constantly being interrupted by the investigator Bluestem he claims the meeting was 6 hours i believe it was only 4 hours I wasn't given much time to testify, however. The respondent was given more time they also submitted a fake note. Which was not taken under consideration. I wrote to the investigator about my concerns. But never heard anything back. On 1 27/ 28/ 2022 I contacted The Waterbury Regional District about the right to Sue letter that I never received that either. I spoke to the regional manager about my concern Mr. Shawn Burns about the investigation that was conducted on December 9th I disagree with it. his advice was to draft up a letter, submit it to him. And he would send it over to the Commissioner to reopening the case

Conclusion.

I am pleading. With the Commissioner. Is there somehow someway that they can just reopen this case? There was so much left out and I wasn't given much time, nor was I given any credibility at all. Even after the respondent submitted a fake note, I can't understand why that Issue was not brought up It was just an absolute communication meltdown.

This letter is the best that I can do to try convincing the commissioner to reopen this case, If possible, I would like to be interviewed by the Commissioner and state other reasons why the Commissioner should reopen this case. Also, I like to add. That during the December 9th video. The investigator said that he was looking for credibility. Well, I believe through testimony and statements that at least something should have gone my way. But then if he's looking for Credibility, then why did he give him so much credit if they came in with a false note? Is what I don't understand. And I'd like to remind you that it was the investigator himself who captured the fake note. That's what brought it up to my attention. What I like to also add is that I don't have a computer with all the fancy hardware. I rely on the Public Library. Which only gives you an hour at a time, so I had drive to Bridgeport from Bridgeport. I had to go

to Stratford and from Stratford I had to go to Norwalk to put together this document. I'd like to thank Shawn Burns for giving me this advice. Because I did not know that you have two years to submit Paperwork or statements to reopen any case.

Respectfully submitted.

*Angel Collazo*

Angel Collazo

angela Collazo @ AOL.com

Subscribed and Sworn to me before me,
a notary public, in and for county of
_____ and state of Connecticut, this
_____ day of _____ 20 22
_____
Notary Public

SHEILA A SOUSA
NOTARY PUBLIC STATE OF CONNECTICUT
My Commission Expires April 30, 2023